[Cite as *Nationstar Mtge., L.L.C. v. Willis*, 2016-Ohio-4721.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| NATIONSTAR MORTGAGE, LLC | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2014-CA-36 |
| | : | |
| v. | : | T.C. NO. 13CV491 |
| | : | |
| TED C. WILLIS, JR., et al. | : | (Civil appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___30th___ day of _____June_____, 2016.

. . . . . . . . . . .

JOHN B. KOPF, Atty. Reg. No. 0075060, 41 S. High Street, 17th Floor, Columbus, Ohio 43215

and

JEREMY D. SMITH, Atty. Reg. No. 0088539, 10050 Innovation Drive, Suite 400, Miamisburg, Ohio 45342
        Attorneys for Plaintiff-Appellee

MARC E. DANN, Atty. Reg. No. 0039425 and GRACE M. DOBERDRUK, Atty. Reg. No. 085547, P. O. Box 6031040, Cleveland, Ohio 44103
        Attorneys for Defendants-Appellants

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Ted C. and Cheryl A. Willis, filed December 11, 2014.   The Willises appeal from the trial court's November 25, 2014 Judgment Entry and Decree of Foreclosure, issued in favor of Nationstar Mortgage LLC ("Nationstar").   We hereby affirm the judgment of the trial court.

{¶ 2} On September 19, 2013, Nationstar filed a "Complaint for Money and Foreclosure" against the Willises, the State of Ohio, Department of Taxation, and the Miami County Treasurer. According to the complaint, Nationstar is the holder of an Adjustable Rate Note, executed on July 14, 2006, by Ted Willis, and secured by a Mortgage.   Nationstar alleged that by reason of default on the Note, "there is due and owing thereon the principal sum of $101,174.66 plus interest at the rate of 8.9% (variable) per annum from May 1, 2013, plus late charges."

{¶ 3} Nationstar further alleged that it is the holder of the Mortgage that was executed to secure the above indebtedness, that the Mortgage was recorded on July 31, 2006, and that it "is the first and best lien after real estate taxes on the real estate property."   Nationstar alleged that the conditions of the Mortgage "have been broken." Nationstar alleged that Cheryl Willis "has or may claim to have an ownership interest in said property."   Nationstar sought judgment against Ted Willis.

{¶ 4}  A copy of the Adjustable Rate Note (Exhibit A) and the Mortgage (Exhibit B) are attached to the complaint, as well as an Assignment of Mortgage (Exhibit C).   The Lender on the July 14, 2006 Note is People's Choice Home Loan, Inc. ("PCHL"), and the Note is executed by Ted Willis in the amount of $180,000.00.   The Note provides:   "I understand that the Lender may transfer this Note.   Lender, or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the

'Note Holder.' " The Note further provides as follows:

> This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.

The Note is numbered pages 1-4, and the final unnumbered page of Exhibit A reflects the following endorsement:

PAY TO THE ORDER OF

_____

WITHOUT RECOURSE
PEOPLE'S CHOICE HOME LOAN, INC
A Wyoming Corporation

By_____
DANA LANTRY
Title: Asst. Vice President

There is a signature on the line above "DANA LANTRY."

{¶ 5} The Mortgage identifies Ted and Cheryl as the borrowers, PCHL as the lender, and MERS (Mortgage Electronic Registration Systems, Inc.) as the mortgagee. The Mortgage indicates that the real property at issue is located at 606 Robinson Avenue, Piqua, Ohio 45356. The Mortgage provides in part: "(E) 'Note' means the promissory note signed by Borrower and dated July 14, 2006. * * *."

{¶ 6} The August 2, 2013 Assignment of Mortgage provides that MERS, as nominee for PCHL, assigns the Mortgage, with all interest secured thereby, to Nationstar.

The Assignment of Mortgage provides in part as follows:

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby acknowledged, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PEOPLE'S CHOICE HOME LOAN, INC., ITS SUCCESSORS AND ASSIGNS * * * (ASSIGNOR)**, by these presents does convey, grant, assign, transfer and set over the described Mortgage together with all interest secured thereby, all liens, and any rights due or to become due thereon, to **NATIONSTAR MORTGAGE, LLC**, * * *.

Said Mortgage was executed by **TED C. WILLIS, JR. AND CHERYL A. WILLIS** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR PEOPLE'S CHOICE HOME LOAN, INC**. * * *.


* * *


**IN WITNESS WHEREOF**, the undersigned has hereunto set its hand by its proper officer on 8/2/2013 * * *.

**MORTGAGE ELECTRONIC RESGISTRATION SYSTEMS, INC. AS NOMINEE FOR PEOPLE'S CHOICE HOME LOAN, INC. ITS SUCCESSORS AND ASSIGNS**


**BY: _____**
**Nadine Homan ASST. SECRETARY**


All Authorized Signatories whose signatures appear above are employed by NTC and have reviewed this documents and supporting documentation prior to signing.


* * *


The foregoing instrument was acknowledged before me on 8/2/2013* * *, by Nadine Homan as ASST. SECRETARY for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR PEOPLE'S CHOICE HOME LOAN, INC., ITS SUCCESSORS AND ASSIGNS, who, as such ASST. SECRETARY being authorized to do so, executed this foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

A signature appears on Homan's signature line above, and the assignment is notarized

by Nicole Baldwin.

**{¶ 7}** A Preliminary Judicial Report was filed on September 19, 2013. The Miami County Treasurer filed an Answer on September 24, 2013. On September 26, 2013, the Willises filed a pro se "Answer and Request for Mediation," and on October 1, 2013, the trial court issued an "Order and Assignment for Foreclosure Mediation." On October 23, 2013, the State of Ohio, Department of Taxation filed an Answer. On April 24, 2014, the Willises filed an "Amended Answer and Request for Mediation."

**{¶ 8}** On July 23, 2014, the trial court issued a "Notice of Hearing," thereby scheduling a pre-trial conference for August 4, 2014. On August 5, 2014, the trial court issued an "Order to Show Cause," which provides in part that at the time scheduled for the pre-trial conference, the Willises appeared but counsel for Nationstar failed to do so, and the "court has not had any contact from counsel and there has not been a request to continue the pretrial conference." The court ordered Nationstar and its counsel to appear and show cause why the matter should not be dismissed for lack of prosecution. On August 6, 2014, the court issued an "Amended Order to Show Cause," thereby ordering Nationstar and its counsel to appear on August 25, 2014. Also on August 6, 2014, Nationstar filed a "Notice of Substitution of Counsel." On August 15, 2014, the court scheduled the matter for trial on September 30, 2014.

**{¶ 9}** On that date, the Willises appeared pro se. At the start of the hearing, counsel for Nationstar moved the court in limine to exclude evidence of "settlement discussions, mediations discussions, hearsay evidence from my client." The court indicated that "whether representations were made about settlements or not made are probably not going to be something the Court can consider, but * * * we'll address those issues as they come up."

{¶ 10} Lisa Gibson testified that she is a "Default Case Specialist at Nationstar Mortgage," and that she "review[s] loans that are in default, review[s] the notes, mortgage, demand letter, payment histories, everything regarding the loan." Gibson stated that she also attends mediations and testifies on behalf of Nationstar at trial. Gibson testified that in "preparing for today's trial, I have reviewed the file thoroughly, * * * I saw the original Note as well as the Mortgage, the payment history, the breach letter, any loss mitigation efforts and loan modification offers, everything in * * * that nature."

{¶ 11} Gibson identified a copy of the Adjustable Rate Note, and she testified that she "also saw the original [here] today." When asked on direct examination, "where has that original been before it was here today," Gibson responded that the original was in "our custodial file in Nebraska," in the possession of Nationstar. When asked about the terms of the Note, Gibson testified as follows:

> * * * It was an adjustable rate mortgage, which means that the * * * rate is subject to adjust. In this particular Note, it does state that the rate would never go greater than 14.9%, and never less than 8.9%, and we're currently at the 8.9 rate on the file. The monthly payment was in the amount of Eight Sixty-one twenty-four ($861.24) and it's indicated that that payment may change.

Gibson testified that the original lender was PCHL, "a Wyoming Corporation," and that the Note bears a blank endorsement, executed by "Dana Lantry, Assistant Vice President at" PCHL. Gibson testified that if the Note is in default, Navistar can accelerate the amount due thereon and seek payment of the remaining balance in full, and that it did so by means of a "breach letter" sent to Ted Willis on July 16, 2013.

**{¶ 12}** Gibson further identified "a copy of the recorded Mortgage that was recorded in Miami County, Troy, Ohio on 7-31 of 2006, and it is executed by Ted. C. Willis and Cheryl A. Willis as Husband and Wife." Gibson stated that the Willises executed the Mortgage on July 14, 2006. Gibson testified that the Mortgage is "the security instrument that also shows * * * who signed it, where the property is located." According to Gibson, pursuant to the Mortgage, Navistar has the right to "collect or be entitled to the property if payments aren't made." Gibson stated that if the Note goes into default, Navistar "will file a foreclosure and proceed with foreclosure." She stated that Notice is required, and that Nationstar accordingly sent a "demand letter."

**{¶ 13}** Gibson identified a copy of "the breach, or also referred to as the demand letter sent to Ted C. Willis by first class mail," which she stated is provided for by the Mortgage. Gibson stated that the demand letter was sent to the "mailing address that we have for Mr. Willis on file, which is 1008 Colleen Drive, Piqua, Ohio." She stated that the Robinson Avenue property, according to "our records, is a rental property." Gibson stated that the demand letter was sent after "the loan was forty-five days past due," and she testified that the letter gave Ted the option to pay what is past due, and advised that foreclosure is the likely consequence of failing to bring the loan current.

**{¶ 14}** On cross-examination by Ted, Gibson identified a copy of the "Customer Account Activity Statement, which is also referred to as the payment history." Gibson testified that she "reviewed it thoroughly in preparation for trial today, and noted that the last payment received on the case was on 5-31 of 2013, which we now show it due for June 1st of 2013." Gibson stated that Nationstar maintains such a record for all of its loans. She stated that the Note is in default as of June 1, 2013. Gibson stated that

Nationstar owns the Mortgage at issue by means of the Assignment of Mortgage, which she states was "recorded August 14th of 2013 in Miami County, Troy, Ohio, by the County Recorder, Jessica A. Lopez."

{¶ 15} The following exchange occurred in the course of Cheryl's cross-examination of Gibson:

* * *

Q. But I guess my only question then, are any of these documents, have they been robo signed?

* * *

A. No they have not.

Q. Can you verify that they haven't been robo signed?

* * *

A. * * * Based on the Exhibits that were presented to me, it's within my understanding to - I may state that – what documents are you referring to specifically? The only ones that were signa – the ones that were signed were by Mr. Willis that were presented in Court. The only one would be the Assignment of Mortgage, which based on the fact that it was endorsed, signed by the Vice President of that previous servicer?

Q. Relative to the foreclosure, were any of the documents relative to the foreclosure robo signed?

A. Not to my knowledge, there was – to my knowledge there was no robo signing involved.

{¶ 16} After Nationstar's exhibits were admitted, Ted called Cheryl to the stand,

and she testified that she was notified of the foreclosure proceedings in September, 2013, and that at that time, "[w]e were still in the modification process." When Ted asked Cheryl to describe what occurred in the court-ordered mediation, counsel for Nationstar objected, and the court indicated, after reviewing the mediator's report, that "it indicates that plaintiff currently is reviewing defendant's application for HAMP Tier 2 modification, and will decide by end of November 2013 whether Defendants qualify for Tier 2. So I mean it's not like there was an agreement reached, and the case was settled." The court asked Ted to explain his purpose in adducing testimony about the mediation process, and Ted responded as follows:

> The purpose of the discussion of the mediation was based upon Nationstar's attorney what they had shared with us that they were going to do. In giving that information, we wanted to make clear to the Court that there was no follow through from Nationstar after that meeting had taken place. That's one of the reasons why we wanted to present this information to the Court that during the mediation we were told that "x" amount of days that we would receive documents and certain other things pertaining to come (sic) to a conclusion of this foreclosure. We never received those documents. And that's why I was asking Cheryl A. Willis pertaining to the information that was spoken to us in that mediation by the attorney of Nationstar.

{¶ 17} The court responded that the information Ted sought to adduce is "just not relevant" and "it's not going to change the outcome of this case at all." The following exchange occurred:

BY MR. WILLIS:

Q.   According to the knowledge that you have pertaining to this particular case, how many times had the information been submitted to Nationstar pertaining to the foreclosure information that had been submitted to myself?

MR. WILLIAMS:   Objection.   Relevance.

THE COURT:   Overruled.   She can answer that.

BY M[S.] WILLIS:

A.   In this process, since the foreclosure, I guess we have submitted about at least, at the very least three packets of the same documents.

* * *

Q.   * * * Next question I need to ask you, pertaining to the information that you had submitted on numerous occasions to Nationstar, are you aware of any information or contact by Nationstar * * * such as a phone call that was admitted by Mildred Glasburg or any information that was pertaining in the Exhibit that we submitted to the Court?

A.   Nothing that we submitted here, but she called them many, many times.   Many, many times.   Sometimes weekly.

Q.   Are you aware of a phone call that was submitted to Mildred Glasburg representing Nationstar pertaining to this particular foreclosure?

A.   Oh yes.

Q.   Can you share information from that phone call that was submitted?

MR. WILLIAMS: Objection.

MR.WILLIS: Your Honor we submitted to the Court an actual document that actually was notarized by the administrator of our Mortgage from Nationstar. The document pertained to information that Nationstar presented to myself as a settlement or offer that would have been, according to me, resolved; that would not have taken us to this position. So this is the reason why I asked Cheryl A. Willis information pertaining to the - - what Nationstar called our administrator, basically giving information pertaining to this particular case. That information has been submitted to the Court, and I'm just asking is she aware of it, that information on what was explained in that document.

* * *

MR.WILLIS: * * * If I may, Your Honor, the reason of this question is to – according to the plaintiffs that we have not responded in a manner pertaining to the Mortgage itself. Neither from our position that from what they have submitted to us that we have not replied back to them in a manner that would resolve this case.

THE COURT: Well, again, you're getting into what would be considered settlement negotiations, and settlement negotiations are not legally relevant during – at trial.

MR. WILLIS: Okay.

THE COURT: So I'd have to sustain his objection and again the only – only issues that are relevant is ["]Did you make the payments or not"

and – and the issue of trying to - failed efforts to who's fault that – that – the - the- re-negotiation of the loan, who's fault that was, whether you tried to do everything you could, or they didn't, aren't relevant anymore.

MR. WILLIS: I understand but may I ask the Court if Nationstar has contacted us and made reference that a settlement had been reached, and they breached their contract with us, based upon the information that we have received that what they offered me and then later came back and changed that offer without giving me prior notice or information pertaining to that offer is exactly why I'm asking her this question. If they called us and made a reference that a certain dollar amount had been implemented and that we had qualified for whatever – whether HAMP 1 or HAMP 2 program, and yet they then changed their mind on us is what brought us to this litigation here today.

THE COURT: Except that neither one of you are the person that had discussion with Nationstar, is that correct?

MR. WILLIS: Correct.

* * *

MR. WILLIS: And the administrator that has been assigned to that Mortgage, from us, as a representative of that Mortgage, and we talked to Nationstar over the phone to let them know that they may contact all advertisements, all information pertaining to this foreclosure, pertaining to the loan modification was to go by Mildred Glasburg. And they agreed.

THE COURT: But she's not here today.

\* \* \*

MRS. WILLIS:   That's why she sent the notarized letter.

MR.WILLIS:   But she sent a letter of notarization validating the statements that she has made as true and binding.

THE COURT:   Well unfortunately she would need to be here today to testify.   They can't cross examine a – this is not – this would be considered hearsay and it doesn't fall within any of the legally recognized exceptions to a hearsay \* \* \* statement.

MR. WILLIS:   And if I may ask, would it be an interest that either Nationstar can validate or non-validate that the call had been made from their office?

THE COURT:   If you had a witness here who is going to testify to that.

MR. WILLIS:    I would like to call back actually the witness that had came here before, if I may.

MR. WILLIAMS:   Your Honor, that testimony would not be relevant, and there's no proffer that Ms. Gibson participated in any such conversation.

\* \* \*

MR. WILLIAMS:    The loan file doesn't include out-of-court statements about whether settlement was reached or not.

\* \*\*

THE COURT:   Well what she should know or she shouldn't know is

a matter that will have to be determined when – I mean you can call her – I'll just give you a chance to call her and put her on the witness stand when you're done with your wife.

\* \* \*

### RE-CROSS EXAMINATION OF LISA GIBSON

BY MR[]. WILLIS:

Q. According to the knowledge of the file that you have represented from Nationstar, do you have knowledge of any phone contact that was made to Mildred Glasburg pertaining to this particular foreclosure?

\* \* \*

A. I do not have knowledge of that call.

Q. \* \* \* Secondly, my next question to you would be for the signing of the actual original Note \* \* \* for Nationstar from Peoples' Choice –

A. Correct.

Q. - you have stated to the Court that you do have the actual blue ink pertaining to – do you have –

A. Absolutely yes. \* \* \*

Q. Do you have in your file at this time (sic)?

A. Yes we do.

Q. Would you present that to the Court?

A. I can have my attorney show that to you, or \* \* \* they'll take care of the formalities but we do have the blue ink signature.

\* \* \*

MR. WILLIAMS:   Your Honor this -   * * *   document is not marked as an Exhibit.

THE COURT:   Well why don't you * * * show it to Mr. Willis, then show it to the Witness.

* * *

MR. WILLIAMS:   (TO MR. WILLIS) You can see the –

MR. WILLIS:   I am very aware –

MR. WILLIAMS:   - the initials there on the bottom of the front –

MR. WILLIS:   I am very aware of the file, sir.

BY MR. WILLIS:

Q.   From this document that has been submitted -

A.   Correct.

Q.   – the original blue ink –

A.   Yes.

Q.   – in the transfer from People's to Nationstar –

A.   Yes.

Q. – has there been any documents to your information pertaining to this particular Note, pertaining to the actual re-signing of the document of 2006, was those documents ever robo signed?

A.   Not to my knowledge, no.   It has a blank endorsement on the back, and what a "blank endorsement" means is that People's Choice can pretty much sell that loan to whoever they choose.

* * *

**{¶ 18}** The following exchange occurred:

MR.WILLIS: * * * I would like to also, Your Honor, if I may, present to the Court the actual letter that was submitted to – to myself by Nationstar. This is actually the letter that was stated from – in the loan mod of March the 12th, 2014. * * *

THE COURT: Before you talk about what's in the letter –

MR. WILLIS: Yes sir.

THE COURT: Have you shown the letter to Mr. Williams?

MR. WILLIS: Sure. I ask to show them the letter sir.

* * *

MR. WILLIS: If I may Your Honor, according to the letter that had been submitted to me by Nationstar, it had been process (sic) of over two years that –

THE COURT: Do you want to testify about the letter?

MR. WILLIS: Oh yes.

THE COURT: Then you'll need to come up here to the witness stand.

* * *

THE COURT: Bring the letter with you.

MR. WILLIS: Yes sir.

**{¶ 19}** Counsel for Nationstar objected to "testimony from the letter * * * as hearsay and more importantly not relevant to the issues that are before the Court * * * on

our action on the Note and Mortgage," and the court indicated that it would allow "the witness [to] testify, and we'll address any hearsay issues if and when they come up." The letter at issue was marked as Defendants' Exhibit 4, and Ted testified as follows:

A. * * * Defendant's 4 is a letter dated March 12, 2014, and it states "Payments must be made via western union or moneygram" and the payment is May 1, 2014 in the amount of Two Thousand Two Hundred Forty-six dollars and ninety-two cents ($2,246.92). It states in the letter that the modification payment is Eight forty-five ($845.00), excluding the escrow, which is the taxes upon the property of Three Hundred and Thirteen Dollars ($313.00), and the estimated total amount of payment would be Eleven Hundred and Fifty-eight Dollars and nine cents ($1,158.09). In receiving this letter, Your Honor, we had received several letters from Nationstar –

THE COURT: Who is the letter from?

A. The letter is from Nationstar Mortgage Corporation.

THE COURT: Okay.

A. In receiving this letter from Nationstar, we contacted Nationstar. One of the things that we had submitted to Nationstar was that the previous letter that we had received * * * from them, actually was actual (sic) a contradiction to the first letter that we had received.

* * *

THE COURT: This letter – Defendant's Exhibit 4 –

A. Yes.

THE COURT:     - it contradicted an earlier letter, is that what you're saying?

A.   Absolutely.   Absolutely.

THE COURT:   Okay.

A.   So from that contradiction, we were trying to seek clarification of which one of these two letters that had been received to us, which one was the binding letter, because the other letter that we received was also supposed to be binding.   Now from that particular letter that we received in March, we were confused, because the previous letter stated completely something different.   And each time that the letters that we had received from Nationstar, it seemed that it was continually to be a repetitious cycle that whatever they stated to us, we could not believe in it. Because every three to four to six months, there was always something that was changing.

THE COURT:   See here * * * Mr. Willis, we are once again back in why a refinancing failed, and again I know it's your position that they couldn't be trusted in anything they said, but whether they couldn't be trusted, or whether it was simple miscommunication, or whether there was something more – something else involved are just – it's not going to - it's not relevant.

A.   The only reason why in stating this Your Honor is that in order for us as a client to make a payment to Nationstar, we needed to find out which one of the letters that we had been submitted was binding.   So in reference to   -   if we received a letter that was pertaining to us to make the judgment or make this Mortgage current or due, and then yet six months

later we receive another letter that changes everything and we were asking which and why are we receiving letters or information pertaining to trying to bring this Mortgage due, which one of these things should we adhere to?

THE COURT: You weren't trying to bring the Mortgage current, * * * you were going to get a different Mortgage Note.

A. Correct.

THE COURT: As opposed to - * * * and the only thing that I can deal with –

A. Yes sir.

THE COURT: - in this case is the Note that was – was identified as the original Mortgage Note. The other Notes that could have superseded this never came into existence, and again I understand it's your position that their fault should make a difference in the Court's enforcing the Note that I have in front of me, * * * it doesn't. It just – I have no legal basis to do that.

A. * * * My question then would be to the Court, * * * how can a client or a Mortgage holder send the payment, when they don't know what the amount is from Nationstar. So if Nationstar is sending me a letter stating that this is the amount that is due, and that they have concluded and then they send me another letter saying, no this changes, how can the client make a payment to bring restitution?

THE COURT: Because you're talking about payment on a different obligation.

A. I understand.

\* \* \*

THE COURT:   \* \* \* the Note that you signed was in default, and they have apparently accelerated it, which means the only amount that could have avoided the foreclosure was the payment of the entire balance of the original Note that was signed.   And anything short of that was just a negotiation \* \* \* to avoid \* \* \* the foreclosure which would follow from the acceleration of the original Note. \* \* \* however strongly you feel about Nationstar's failures, it's not something that I can consider and will change the outcome of this case.

{¶ 20} The following exchange occurred on Ted's cross-examination by counsel for Nationstar:

\* \* \*

Q.   \* \* \* You mentioned that the settlement letters, \* \* \* the loan modification letters were contradictory, correct?

A.   Yes.

Q.   And you brought one here today that was an actual offer of workout with terms that you considered to not be attractive.   Is that correct?

A.   Correct.

Q.   And – and so you didn't sign that document?

A.   Correct.

Q.   But you saw the Note earlier, you did sign the Note, correct?

A.   Correct.

Q.   And – and the Mortgage, you signed it?

A.   Correct.

Q.   And you promised to pay the money back?

A.   Correct.

Q.   And then was there a time when you were unable to pay the money back?

A.   Correct.

Q.   And you – you did receive the breach letter that was sent telling you that you could cure the default, if you paid a certain amount of money?

A.   Correct.

Q.   And * * * either you didn't have the money to make that payment or you decided not to make that payment, is that correct?

A.   Didn't have the money.

Q.   The letter that you say you received that was contradictory to the one that you showed us here today, you didn't bring that in.   Is that correct?

A.   No.

Q.   And is that because you don't have that letter?

A.   Didn't have time to prepare for it.

Q.   Okay but that letter wasn't a contract offering a workout agreement, with a signature line for you that you could have sent in, is that correct?

A.   That is incorrect.

Q.   So why didn't you send it in, if – if it was an offer that was to modify the contract and that was an attractive term to you?

A. That was the information we were preparing to wait for from Nationstar to submit to us.

Q. But you said that you received the contract offer that had a signature line for you to return.

A. We received information pertaining to an offer from Nationstar if we would sign.

Q. So you did not receive a contract to sign –

A. I did receive a letter from Nationstar pertaining to a contract for me to sign. I did not sign the letter.

Q. And – and the letter that you saw, that you received March 29th had terms that you didn't like, so you didn't sign that. Is that correct?

A. Different from the terms that we had previously received, no I did not sign it.

{¶ 21} At the conclusion of Ted's cross-examination, Cheryl indicated to the court that she had "one question for the Nationstar representative," and the following exchange occurred:

Q. * * * Who from Nationstar, since you don't have any knowledge of robo signing, who from Nationstar * * * verifies that no robo signing on foreclosure documents had taken place?

* * *

A. To my knowledge, we have a Quality Assurance Department that verifies all the loans that come in on the boarding process, when a loan is service-transferred.

{¶ 22} On November 6, 2014, the trial court issued a "Decision Granting Judgment to Plaintiffs on Complaint in Foreclosure," which provides in part as follows:

* * *

At trial, the plaintiff demonstrated that Ted C. Willis executed an adjustable rate note that was secured by a mortgage on 606 Robinson Avenue, in Piqua, Ohio, a rental property. The mortgage was executed by both Ted and Cheryl Willis. The plaintiff also demonstrated that the conditions of the note and mortgage had been breached in that Ted Willis had not paid the note in accordance with its terms. Specifically, the note has been in default since the last payment was received on May 31, 2013.

The defendants feel they were misled by Nationstar about their ability to modify the loan. The parties did attempt to mediate the foreclosure action, and the plaintiff did offer a loan modification that the defendants did not sign. Notwithstanding the disagreement over Nationstar's failure to offer a loan modification acceptable to the Willises, the plaintiff has established the elements of a foreclosure action. The court also finds that, after considering the equities, the plaintiff is entitled to a decree of foreclosure and to an order from the court that the property subject to the mortgage shall be sold at sheriff's sale in accordance with law.

Counsel for the plaintiff shall prepare a Judgment Decree of Foreclosure consistent with this decision and the evidence presented at trial.

* * *

{¶ 23} On November 20, 2014, a "Notice of Filing of Final Judicial Report" was filed, along with an "Affidavit Regarding Military Status." On November 25, 2014, the "Judgment Entry and Decree in Foreclosure" was filed, which provides in part:

> * * *
>
> The Court * * * finds that there is due to Plaintiff on the Note principal in the amount of $101,174.66 plus interest on the principal amount at the rate of 8.0% per annum from May 1, 2013, adjusted as per the terms of the Note. The Court finds that there is due on the Note all late charges imposed under the Note, all advances made for the payment of real estate taxes and assessments and insurance premiums, and all costs and expenses incurred for the enforcement of the Note and Mortgage, except to the extent the payments of one or more specific such items is prohibited by Ohio law.
>
> As a result, the Court hereby enters judgment for the amount due on the Note in favor of Plaintiff and against Ted C. Willis, Jr.
>
> The Court finds that the Mortgage was recorded with the County Recorder and is a valid and subsisting first mortgage on the Property. The Court further finds that the parties to the Mortgage intended that it attach to the entire fee simple interest in the Property. The Mortgage is, however, junior in priority under Ohio law to the lien held by the County Treasurer to secure the payment of real estate taxes and assessments. All amounts payable under Section 323.47 of the Ohio Revised Code shall be paid from the proceeds of the sale before any distribution is made to other lien

holders.

* * *

**IT IS THERFORE ORDERED, ADJUDGED AND DECREED** that unless the sums found to be due to Plaintiff are fully paid within three (3) days from the date of the entry of this decree, the equity of redemption of the defendant title holders in the Property shall be foreclosed and the Property shall be sold free of the interests of all parties to this action. In addition, an order of sale shall issue to the Sheriff of Miami County, directing him to appraise, advertise and sell the Property according to the law and the orders of this Court and to report his proceedings to this Court.

{¶ 24} On December 11, 2014, Willis filed a "Combined Motion to Stay Sheriff's Sale and for Waiver of Supersedeas Bond of Defendants Ted C. Willis, Jr. and Cheryl A. Willis." On December 17, 2014, a "Praecipe for Order of Sale" was issued. On the same date, the trial court issued an "Order Granting Stay of Execution Upon Posting Supersedeas Bond."

{¶ 25} Willis asserts two assignments of error herein which we will consider together. They are as follows:

THE TRIAL COURT ERRED BY GRANTING A JUDGMENT AND DECREE OF FORECLOSURE,

And,

THE TRIAL COURT ERRED BY GRANTING A JUDGMENT OF FORECLOSURE WHEN IT WAS AGAINST THE EQUITIES BECAUSE APPELLEE PROMISED NOT TO PROCEED WITH FORECLOSURE

DURING THE LOAN MODIFICATION PROCESS.

{¶ 26} According to the Willises, the Assignment of Mortgage attached to the Complaint was purportedly executed by MERS as nominee for PCHL to Nationstar on August 8, 2013, "but the assignment actually appears to have been executed by an employee of Nationwide Title Clearing ('NTC')." Further, according to the Willises, in "the top left corner of the assignment it states when recorded return to Nationstar c/o NTC and right below the signature of Nadine Homan i[t] states, 'All Authorized Signatories whose signatures appear above are employed by NTC and have reviewed this document and supporting documentation prior to signing.' " The Willises assert that Nationstar "never produced any evidence at trial that NTC was authorized to execute an assignment of Appellants' mortgage signing for MERS or acting on behalf of original lender [PCHL]." The Willises assert that they "specifically questioned [Nationstar's] witness about robo-signing in their case."

{¶ 27} Regarding their first assigned error, the Willises assert that Lisa Gibson's testimony "does not appear to have been made upon personal knowledge and was not sufficient to support a judgment and decree of foreclosure for * * * Nationstar." According to the Willises, although Gibson "states that the original note had been in the custodial file in Nebraska, [Nationstar's] witness never testified that [Nationstar] had possession of Appellant Willis's original note when the Complaint" was filed.

{¶ 28} The Willises argue that Gibson "never testified as to where the blank endorsement was, whether it was on the back of the note or by an allonge. The Complaint * * * merely has a note and then a separate piece of paper with an indorsement in blank from [PCHL]." The Willises argue that if the "indorsement appeared on an

allonge then [Gibson] would have needed to testify that the allonge was affixed to the original note at the time the complaint was filed and was currently affixed to the note. *See* R.C. 1303.24." The Willises assert that Gibson "never mentioned an allonge and had never seen the original note prior to the day of trial so she lacked personal knowledge to testify regarding the appearance of the original note prior to September 30, 2014."

**{¶ 29}** The Willises assert that pursuant to R.C. 1303.31(A), "lack of possession of the original note would prevent * * * Nationstar from being entitled to enforce the note." According to the Willises, "Nationstar did not establish that it was a holder of the note because Appellee did not establish that it had possession of the original note at the time this case was filed." Accordingly, the Willises argue, "Nationstar was not entitled to enforce Appellant's note under R.C. 1303.31(A)(2) as a nonholder in possession because Appellee may not have had possession of the original note. Possession of a copy of the note would not entitle Appellee Nationstar to enforce the note or mortgage." The Willises rely in part on *BAC Home Loan Serv. v. McFerren*, 2013-Ohio-3228, 6 N.E.3d 51 (9th Dist.).

**{¶ 30}** The Willises assert as follows:

The assignment of Appellant's mortgage admits that the assignment was not executed by an employee of original lender [PCHL] or MERS. The assignment was executed by an employee of NTC. Although the assignment claims an NTC employee was authorized to execute the assignment, Appellee Nationstar conducted a trial without presenting any documentary evidence that a separate company such as NTC would have authority to assign Appellants' mortgage. The trial court erred by granting

a judgment of foreclosure without evidence to establish that the assignment was valid.

     \* \* \*

At trial Appellant Mrs. Willis cross-examined Appellee's witness Lisa Gibson on the issue of whether any documents in the foreclosure had been robo-signed. When Appellant Mrs. Willis asked for verification that documents had not been robo-signed the Appellee's witness responded:

The only one would be the Assignment of Mortgage, which based on the fact that it was endorsed, signed by the Vice President of that previous servicer?   \* \* \*

There are two significant aspects of Appellee's witness Lisa Gibson's response. First, Appellee's witness demonstrated her lack of personal knowledge about the documents because she incorrectly stated that the assignment of mortgage was signed by the Vice President of the previous servicer when the face of the assignment purports to have been executed by an Asst[.] Secretary and not by a servicer. \* \* \*

Second, based on this statement by Appellee's witness she seems to be admitting that the assignment of mortgage was invalid so the trial court erred by granting a judgment of foreclosure.

{¶ 31} Regarding the Willises' second assignment of error, they assert that it was inequitable for the court to grant a judgment of foreclosure since Nationstar filed its complaint against them "when they were still in the modification process," and the "review was not concluded after the mediation ended." The Willises direct our attention to

Cheryl's testimony that Nationstar "represented 'that no foreclosure would happen if we were in the modification process,' " and they assert that "the court did not fully address this issue." Willis directs our attention to this Court's decision in *Wells Fargo Bank, N.A. v. Fortner*, 2d Dist. Montgomery No. 26010, 2014-Ohio-2212. Finally, Willis asserts that in the course of the trial, "the judge made comments about the relevance of the loan modification discussions and did not properly consider the representations made by Appellee and the lack of a good faith review of the documents by [Nationstar] when the trial court was supposed to weigh[] the equities of foreclosure."

{¶ 32}  Nationstar responds that "the Willises waived their standing defense by not asserting it at trial," and that "there is sufficient evidence in the record to show that Nationstar had standing."  Citing *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, Nationstar asserts that while "a challenge to a trial court's *subject matter* jurisdiction may be raised for the first time after judgment, the Ohio Supreme Court recently held that *standing* is *not* a question of subject matter jurisdiction."  According to Nationstar, the Willises "allowed the Trial Court to exercise jurisdiction by not informing the Judge and requesting proof at trial that Nationstar had supposedly invoked jurisdiction without having an interest in the proceeding.  By failing to assert standing as a defense at trial, the Willises waived it, and they cannot assert it for the first time on appeal."

{¶ 33} Nationstar asserts, alternatively, that "even if the Willises did not waive standing (and they did), the Willises have not demonstrated that the Trial Court's decision is against the manifest weight of the evidence which was presented at trial."  Nationstar asserts that the "majority of the Ohio Courts of Appeal have followed the plain language

of [*Fed. Home Loan Mtge. Corp. v. Schwarzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214] and held that a plaintiff in a foreclosure action need only establish an interest in the note *or* the mortgage at the time the suit is filed." According to Nationstar, "when a note and mortgage refer to each other, a plaintiff who is an assignee of the mortgage is entitled to enforce *both* the note and the mortgage even if there is no evidence that the plaintiff is in possession of the note." Nationstar directs our attention in part to this Court's decisions in *Fed. Home Loan Mtge. Corp. v. Trissell*, 2d Dist. Montgomery No. 25935, 2014-Ohio-1537, and *Bank of N.Y. Mellon v. Clancy*, 2d Dist. Montgomery No. 25823, 2014-Ohio-1975.

**{¶ 34}** According to Nationstar, since it "presented uncontested evidence at trial that it had been assigned the Mortgage before the date of the Complaint, Nationstar had provided some competent and credible evidence from which the Trial Court could find that Nationstar had standing when the Complaint was filed." Nationstar asserts that it "had also presented the original Note at trial, and moved a copy of the original Note and a copy of the recorded Mortgage into evidence, again without any objection by the Willises." Pursuant to *Trissell* and *Clancy*, according to Nationstar, "because the Note and Mortgage refer to each other, the evidence of the Assignment alone was sufficient to demonstrate standing."

**{¶ 35}** Nationstar argues that the Willises' challenge to the validity of the Assignment of Mortgage fails for three reasons, namely that Willis "did not present this issue to the Trial Court," that the Willises "are not a party to the Assignment and lack standing to challenge its validity," and that "the uncontroverted evidence in the trial court record refutes, rather than supports, the Willises' argument that the Assignment was not

signed with authority."   Nationstar argues as follows:

> * * * The assignment itself is notarized, states that it is being signed by MERS through one of its assistant secretaries, Ms. Homan, and provides in the notarization that Ms. Homan is personally known to the notary and is "authorized" to sign the Assignment. * * * Within the Assignment, Ms. Homan also states that she is signing as a "proper officer."   * * * This evidence was admitted without objection.   * * * There was some competent and credible evidence in the trial record from which the Trial Court could conclude that Ms. Homan was, in fact, an assistant secretary of MERS with authority to execute the Assignment.

> The Willises suggest that there also had to be additional evidence that "employees of NTC had authority to assign" the Mortgage. * * * No such evidence was necessary because there is nothing in the record that suggests that **NTC** ever held the interest in the Mortgage.   **MERS** held the interest in the Mortgage, not NTC.   The record shows that the Assignment was, in fact, executed by MERS, through one of its assistant secretaries, Ms. Homan. It does not matter if Ms. Homan was **also** employed by NTC, McDonalds, or the United States government.   The record reflects uncontroverted evidence that she was an assistant secretary of MERS who signed the notarized Assignment as a "proper officer" and someone who was "authorized" to do so. * * * The Willises presented no evidence to the contrary.

{¶ 36}  Nationstar asserts that alternatively, "the record contains competent and

credible evidence from which the Trial Court could have concluded that Nationstar had standing via the Note." According to Nationstar, the "Judgment Entry does not make an express finding as to when Nationstar came into physical possession of the Note, and the Willises did not request findings of fact. Accordingly, this Court should affirm if there is some evidence from which the Trial Court could have concluded that Nationstar possessed the Note on the day it filed the Complaint."

{¶ 37} Finally, Nationstar asserts that foreclosure is the appropriate remedy. Nationstar argues that "settlement discussions cannot be used to refute the validity of Nationstar's claim for foreclosure." According to Nationstar, "to the extent that the Willises argue that Nationstar's alleged statements are enforceable agreements not to foreclose, the Stature of Frauds precludes that result. Contracts that fall within the Statute of Frauds * * * must be in writing signed by the party against whom the contract is being enforced." Nationstar argues that, "[a]ccordingly, oral agreements to modify mortgage loans are unenforceable." Nationstar argues that it "had no duty to modify the Note and Mortgage, regardless of whether or not the parties were in negotiations." Nationstar asserts that "Ohio courts have routinely held that a lender does not act in bad faith by pursuing its contractual remedies instead of a modification." Nationstar argues that the Willises' reliance upon *Fortner* "is misplaced." According to Nationstar, "to the extent that the Willises argue that Nationstar broke its promise to review them for a loan modification * * * there is no evidence that Nationstar ever made such a promise. That alleged promise came from a statement in the Mediator's report that the Judge read during trial, not from affirmative evidence presented by the Willises." Finally, Nationstar asserts that even if it "had a duty to engage in loss mitigation efforts, the evidence is that

the parties completed the loss mitigation process and were unable to reach an agreement."

**{¶ 38}** The Willises' initial arguments are addressed to whether Nationstar obtained the right to enforce the July 14, 2006 Note. According to the Willises, Nationstar was unable to establish that it is entitled to enforce the Note as a holder, or as a non-holder in possession, pursuant to R.C. 1303.31(A)(1) and (2).

**{¶ 39}** As this Court noted in *U.S. Bank v. Christmas,* 2d Dist. Montgomery No. 26695, 2016-Ohio-236, ¶ 27, citing *Clancy* and *McFerren*:

> The Ohio Supreme Court held in *Federal Home Loan Mort. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012–Ohio–5017, 979 N.E.2d 1214, that "the plaintiff in a foreclosure action must have standing at the time that it files its complaint." *Wells Fargo Bank, N.A. v. Horn*, 142 Ohio St.3d 416, 2015–Ohio–1484, 31 N .E.3d 637, ¶ 12. " 'The requirement of an "interest" can be met by showing an assignment of either the note or mortgage.' " *Bank of New York Mellon v. Clancy*, 2d Dist. Montgomery No. 25823, 2014–Ohio–1975, ¶ 12, quoting *Fed. Home Loan Mtge. Corp. v. Koch*, 11th Dist. Geauga No. 2012–G–3084, 2013–Ohio–4423, ¶ 24. *But see BAC Home Loan Serv. v. McFerren*, 2013–Ohio–3228, 6 N.E.3d 51, ¶ 13 (9th Dist.) (requiring a showing of an interest in both the note and mortgage). Accordingly, "a properly assigned mortgage is 'sufficient to demonstrate * * * standing under *Schwartzwald*.' " *Clancy* at ¶ 28, quoting *HSBC Bank USA v. Sherman*, 1st Dist. Hamilton No. C–120302, 2013–Ohio–4220, ¶ 15.

**{¶ 40}** As noted above, the documents attached to Nationstar's Complaint reflect

that Ted and Cheryl executed the Mortgage on July 14, 2006. The Mortgage refers to the Note of the same date. The Mortgage reflects that MERS is the nominee of PCHL, and the Assignment of Mortgage reflects that MERS, as the nominee of PCHL, conveys, grants, assigns, transfers and sets over the Mortgage, "with all interest secured thereby, all liens, and any rights due or to become due thereon" (which include the Note) to Nationstar. As this Court noted in *Trissell*, such "cross-referencing between the instruments is sufficient to establish a rebuttable presumption of intent to convey both the mortgage and the note." *Id.*, ¶ 15.

**{¶ 41}** While an assignment of mortgage is sufficient to transfer both the Mortgage and the Note herein, the Willises claim (for the first time on appeal) that the Assignment of Mortgage was improper because it was executed by an employee of "NTC," namely Nadine Homan. We need not address this argument, however, since the Willises are not a party to the Assignment of Mortgage, as Nationstar asserts, and they accordingly lack standing to challenge its validity. *In Clancy*, this Court determined that Clancy lacked standing to challenge the validity of the Note and Mortgage therein, in reliance in part upon the Eighth District's decision in *Bank of New York Mellon Trust Co. v. Unger,* 8th Dist. Cuyahoga No. 97315, 2012-Ohio-1950, ¶ 35. In *Unger*, as here, the assignee of a mortgage sought foreclosure, and the Ungers, as mortgagees, challenged the validity of the assignments of the mortgage. *Id.,* ¶ 2. The Eighth District reasoned as follows:

> In order to have standing to assert a claim in Ohio, a party must demonstrate an "injury in fact." * * * "An injury in fact requires a showing that the party suffered or will suffer a specific injury, that the injury is traceable to the challenged action, and that it is likely that the injury will be redressed

by a favorable decision." * * *

    * * *

    * * * The mortgage assignments did not alter the Ungers' obligations under the note or mortgage. Mellon filed the foreclosure complaint based on the Ungers' default under the note and mortgage, not because of the mortgage assignments. The Ungers' default exposed them to foreclosure regardless of the party who actually proceeds with foreclosure. The Ungers, therefore, failed to show they suffered or will suffer any injury, the injury is traceable to the mortgage assignments, and it is likely a favorable decision will remedy the injury. The trial court properly granted Mellon's motion for summary judgment because the Ungers lacked standing to challenge the mortgage assignments. * * *

**{¶ 42}** As in *Unger*, as the Willises are not a party to the Assignment of Mortgage, they lack standing to challenge its validity. Since the assignment does not alter Ted's responsibilities and obligations under the Note, and since Ted admitted on cross-examination that he defaulted on the Note, his default exposed him to a foreclosure action regardless of the identity of the plaintiff who may prosecute such action.

**{¶ 43}** Regarding the Willises' final argument, in reliance in part on *Fortner*, 2014-Ohio-2212, that the trial court's judgment of foreclosure was against the equities, we agree with Nationstar that foreclosure is the appropriate remedy, and we conclude that *Fortner* is distinct from the matter herein. In *Fortner*, the Fortners appealed from a trial court order confirming the sale of their home in foreclosure after overruling their motion to set aside the sale. *Id.*, ¶ 2. This Court determined that "the Fortners' affidavit raises

the issue of whether Wells Fargo made representations that it would not proceed with foreclosure while the Fortners' loan-modification was pending, and whether the Fortners reasonably relied upon that representation to their detriment." *Id.*, ¶ 2. This Court reversed the trial court's judgment confirming the sale and remanded the matter for further proceedings. *Id.*

{¶ 44} By way of background, Wells Fargo obtained a default judgment against the Fortners after they failed to enter an appearance in the foreclosure action against them, and an order of sale was issued. *Id.*, ¶ 3. After the premises were sold, but before the sale was confirmed, the Fortners filed a motion to set the sale aside, supported by Cody Fortner's affidavit, in which she averred that she and her husband completed an application for a loan modification, and Wells Fargo advised them "that the foreclosure action would be put on hold pending the review of the application **and not to worry.**" *Id.*, ¶ 5 (emphasis in original). The trial court denied the motion to set aside the sale and "later entered an order confirming the sale." *Id.*, ¶ 7. On appeal, the Fortners asserted in part that "Wells Fargo engaged in 'trickery' by misleading them, causing them to believe that the property would not be sold while their loan modification application was pending." *Id.*, ¶ 7.

{¶ 45} This Court noted that the trial court failed to consider the effect of the pending loan modification application, and noted that attached to Cody's affidavit was "a document entitled 'Homeowner Assistance Form,' which the Fortners filled out, with their signatures next to the handwritten date of July 1, 2012." *Id.*, ¶ 10. This Court noted, and concluded, as follows:

> In a case discussing whether filing a foreclosure action while

engaging the homeowner in loan modification discussions constitutes frivolous conduct, this court, in *Bank of New York Mellon v. Ackerman*, 2d Dist. Montgomery No. 24390, 2012–Ohio–956, ¶ 8, stated:

> That modification discussions were ongoing did not bar the bank from seeking foreclosure. The Ohio Supreme Court said in one foreclosure case that "[the lender]'s decision to enforce the written agreements cannot be considered an act of bad faith." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074, 1996–Ohio–194. The Court then quoted the Seventh Circuit Court of Appeals: " 'firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith." ' " *Id.*, quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990). "Indeed," said the Court, "[the lender] had every right to seek judgment on the various obligations owed to it by [the borrower] and to foreclose on its security." *Id.* In a recent Tenth District foreclosure case, *U.S. Bank Natl. Assn. v. Mobile Assoc. Natl. Network Sys., Inc.*, 195 Ohio App.3d 699, 2011–Ohio–5284, 961 N.E.2d 715 (10th Dist.), before the bank filed a foreclosure action it and the borrowers had agreed in a letter to negotiate about the borrowers' obligations. The borrowers

asserted that the letter agreement was a binding contract that modified the loan to require the parties to negotiate. They contended that the bank failed to negotiate, breaching the modified loan. Until the bank negotiated, argued the borrowers, it should be estopped from foreclosing. The Tenth District rejected this argument for several reasons. Pertinent among them, the court said that the bank had the right to initiate foreclosure proceedings. The court found that a provision in the loan documents provided that "the bank was entitled to immediately initiate foreclosure proceedings in the event of default." *U.S. Bank* at ¶ 1. "The bank's decision to pursue its contractual remedies," said the court, "cannot be considered to be an act of bad faith." *Id.*, citing *Ed Schory* at 443, 662 N.E.2d 1074. Also, in a Fifth District foreclosure case, *Key Bank Natl. Assoc. v. Bolin*, 5th Dist. Stark No. 2010 CA 00285, 2011–Ohio–4532, the trial court granted summary judgment for the lender on its foreclosure complaint. The borrower argued that the trial court erred and abused its discretion by doing so because the lender acted in bad faith and misrepresented to the borrower that she could participate in a loan modification program. The appellate court rejected this argument. It found that no provision in the mortgage document "prevent[ed] the lender from insisting on the strict

performance of the mortgage obligations." *Key Bank* at ¶ 37. And the court found that no provision required the bank to allow the borrower to participate in loan modification.

The opinion went on to hold that the trial court did not err in rendering summary judgment against the homeowners, because they did not submit competent evidence supporting their claim that "they signed and notarized a loan-modification agreement with the bank and they have been 'willing and able to pay each month' under its terms." *Ackerman* at ¶ 16–17.

Unlike *Ackerman*, the Fortners did submit an affidavit supporting the Home Owners Assistance Form. However, that form does not purport to be a loan modification agreement; rather it purports to be an application for loan modification. Furthermore, the form contains an acknowledgment that it does not constitute a waiver of the bank's right to proceed with foreclosure. Another distinction with *Ackerman* involves the fact that the Fortners' Home Owners Assistance Form was completed four months after the entry of the default judgment and decree of foreclosure, while the Ackermans claimed that they actually entered into a loan modification agreement prior to the entry of the foreclosure judgment.

In the case before us, because a judgment of foreclosure had already been entered, the parties had not entered into any modification agreement, and there is no claim that the Fortners were making payments under a modification agreement, we would conclude that the pendency of the loan modification application was not a basis for setting aside the sale, but for

Cody Fortner's affidavit. In her affidavit, she avers that Wells Fargo made a representation that it would not proceed with the foreclosure action while the loan modification was being discussed. This raises the issue of whether that representation was, in fact, made, and whether the Fortners reasonably relied upon it to their detriment. This issue was not addressed by the trial court.

*Id.*, ¶ 11-14. Since the trial court "erred by failing to address the issue of whether Wells Fargo made a representation to the Fortners upon which they reasonably relied to their detriment," this Court reversed and remanded the matter for further proceedings. *Id.,* ¶ 21-22.

{¶ 46} We conclude that, unlike in *Fortner*, there were no remaining issues for the court to resolve herein. The record reflects that Nationstar filed its complaint on September 19, 2013, and that Nationstar and the Willises engaged in mediation. The court's review of the mediator's report indicates that Nationstar reviewed the Willises' application for modification and "will decide by end of November 2013 whether [the Willises] qualify for [HAMP] Tier 2." As the trial court noted, "it's not like there was an agreement reached, and case was settled." Defendants' March 12, 2014 Exhibit 4, correspondence from Nationstar to Ted Willis, provides as follows:

* * *

Payment and signed documents must be received by, May 1, 2014 in the amount of $2,246.92.

**Your modified payment is $845.08 (excluding your escrow of $313.01 – subject to change upon escrow analysis). Your estimated total**

**payment per month is $1158.09.**

This letter is to inform you of the requirements to complete your loan modification that was recently granted to you by Nationstar Mortgage.

* * *

**{¶ 47}** Attached to the correspondence is an unexecuted Loan Modification Agreement, as well as a March 12, 2014 "Letter of Acknowledgment" that provides in part as follows:

Dear Ted C. Willis Jr.,

Attached for execution is the Modification Agreement for your loan serviced by Nationstar Mortgage, LLC. * * *

By executing this Letter of Acknowledgment and the Modification Agreement, you are agreeing to make a qualifying payment of $2,246.92 dollars ("Qualifying Payment") for your Modification Agreement to become effective. * * * *If you fail to make this qualifying payment * * *, the Modification Agreement shall be deemed invalid and Nationstar Mortgage, LLC shall have no obligation to modify your loan in accordance with the terms of the Modification Agreement.* (Emphasis added).

* * *

**{¶ 48}** The record reflects that following mediation and an offer of loan modification, Ted did not execute the Loan Modification Agreement, and we have no basis to conclude that, since he was not in agreement with its terms (which included the invalidation of the agreement upon his failure to make the qualifying payment), that

foreclosure "was against the equities." In other words, Nationstar had the right to initiate foreclosure proceedings.

{¶ 49} Since Nationstar obtained the right to enforce the Note, the Willises lacked standing to challenge the Assignment of Mortgage, and foreclosure is the appropriate remedy, the Willises' assigned errors are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

John B. Kopf
Jeremy D. Smith
Marc E. Dann
Grace M. Doberdruk
Hon. Christopher Gee